# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Bky. No. <u>21-40644</u> |
| Petros Charalampopoulos, | |
| Chapter 7 | |
| Debtor. | |
| Corey and Jessica Pollock, | Adv. Pro. No. _____ |
| Plaintiffs | |
| vs. | |
| Petros Charalampopoulos, | |
| Defendant. | |

## COMPLAINT TO DETERMINE DISCHARGEABILITY OF A DEBT AND FOR JUDGMENT

Plaintiffs Corey and Jessica Pollock as and for their Complaint against Defendant Petros Charalampopoulos, allege and state as follows:

1

I.

Defendant Petros Charalampopoulos ("Defendant") filed a petition for relief under Chapter 7 of Title 11, United States Code, on April 13, 2021.

II.

Plaintiffs Corey and Jessica Pollock (the "Pollocks") are creditors of Defendant.

III.

This is a core proceeding over which the court has jurisdiction under 28 U.S.C. §§ 157 and 1334, and Fed. R. Bankr. P. 7001. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1408 and 1409.

IV.

This is an adversary proceeding to determine the dischargeability of a debt under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6).

V.

Defendant is, or was, the primary owner of DLM Lasers, LLC a Minnesota limited liability company ("DLM").

VI.

Defendant and DLM engage, or engaged, in the business of selling and servicing laser cutting devices, including, but not limited to, machines that perform

computer numerical control, or "CNC" laser cutting of sheet materials, such as plywood.

VII.

On or about April 10, 2019, the Pollocks contacted Defendant seeking to purchase a CNC laser cutting machine should Defendant have a machine that met their required performance standards.

VIII.

During the April 10, 2019 conversation, the Pollocks told the Defendant exactly what they were looking for in a CNC machine, their intended use of the CNC machine, and sought advice from the Defendant as to what machine would meet their needs.

IX.

The Pollocks also repeatedly expressed the importance of the reliability and performance of any CNC unit they might purchase.

X.

On or about April 10, 2019, Defendant represented to the Pollocks that a 1325 servo-guided 300W CNC machine with an air compressor and solenoids (the "machine" or "unit") would satisfy their needs.

XI.

Defendant assured the Pollocks that the CNC machine's reliability, performance, and longevity would fulfill the specific requirements the Pollocks communicated to Defendant.

XII.

Defendant represented to the Pollocks that the machine's motors were Japanese DC brushless Yaskawa motors.

XIII.

Defendant represented to the Pollocks that the machine's CO2 servo-motors could go up to 800mm per second and could provide 125 pounds of torque.

XIV.

Defendant represented to the Pollocks that he and his company custom build every machine they sell and would do the same for the Pollocks.

XV.

Defendant represented that the unit would have a two year warranty and that he would provide lifetime support of the machine.

XVI.

Defendant told the Pollocks that the total price would be $27,500 and that he would provide the Pollocks a formal quote.

XVII.

On or about April 11, 2019, Defendant emailed the Pollocks a proposal consistent with the verbal communications between the parties. In that proposal, Defendant represented the unit as:

> DLM 1325 CO2 laser cutting/engraving machine 300W
>     Motion system: Yaskawa DC brushless servo motors;
>     Laser Tube: Yogli 300W CO2 laser tube
>     Rails: Linear guides
>     Voltage: 11 0V 25A

XVIII.

After receiving the proposal, the Pollocks yet again sought confirmation from Defendant that the CNC machine would meet their needs.

XIX.

Defendant again provided assurances to the Pollocks that the machine met the requirements that the Pollocks had expressed to him.

XX.

On or about April 24, 2019, the Pollocks informed Defendant that they were ready to order the recommended unit.

XXI.

The Pollocks only agreed to order the machine because of Defendant's representations regarding its specifications and performance standards.

XXII.

The Pollocks would not have ordered the machine if it did not meet the specifications and performance standards that they requested and that Defendant promised to provide.

XXIII.

The Defendant knew the Pollocks would not have ordered the machine if it did not meet the specifications.

XXIV.

On or about April 29, 2010, the Pollocks wired Defendant the entirety of the purchase price which by that time had increased to $29,300. Defendant confirmed receipt on or about May 2, 2019.

XXV.

Despite Defendant's representations that the unit would be delivered within 65 days, it did not arrive until August 14, 2019; 107 days after the Pollocks paid Defendant.

XXVI.

When the Pollocks received the unit, they discovered it was damaged and did not conform to the description and specifications Defendant promised to provide to them.

XXVII.

The Pollocks promptly advised Defendant who responded that he would fix everything when he arrived to service the unit on August 31, 2019.

XXVIII.

Defendant arrived at the Pollocks' shop on or about the morning of August 31, 2019 to service the unit. Defendant worked on the unit during the day and left that afternoon.

XXIX.

Defendant represented to the Pollocks that the machine worked properly.

XXX.

When the Pollocks initially attempted to use the unit on the evening of August 31, 2019, they immediately noted that it was not cutting within the promised tolerances. The Pollocks promptly contacted Defendant about the problem.

XXXI.

Between August 31 and November 15, the Pollocks repeatedly attempted to work with Defendant to calibrate and/or modify the unit such that it would achieve the promised performance.

XXXII.

At various times, Defendant attempted to blame the nonperformance on excuses such as software problems and moisture in the air.

XXXIII.

On or about October 2, 2019, Defendant stated that he would come over and "sort it out. I will replace the controller unit." He also admitted that the machine was "messed up."

XXXIV.

Given the continued non-performance of the unit, the Pollocks requested that DLM accept a return of the unit. Defendant rejected that request.

XXXV.

On October 21, 2019, the Pollocks provided Defendant with several dates certain by which the promised parts, services, and performance must be provided. Defendant agreed to meet the demands made by Pollocks.

XXXVI.

Defendant visited the Pollocks' shop on October 26, 2019, in order to fix the unit. Instead of repairing the machine, Defendant suggested that the problem could potentially be solved by the Pollocks putting wood blocks under the unit, to steady the supposedly brand new machine. Defendant failed to fix the unit during his visit.

XXXVII.

On or about October 28, 2019, the Pollocks again demanded the transaction be rescinded.

XXXVIII.

On or about October 29, 2019, Defendant finally disclosed to the Pollocks that the unit had the "wrong" motors. Instead of the elite Yaskawa motors, the unit had been delivered with lower quality motors.

XXXIX.

Defendant requested that the Pollocks allow an engineer to travel to their location and replace the motors with the "correct ones." In response, Defendant promised that if the engineer did not fix the problem that same day he would wire the entire purchase price back to the Pollocks' bank account.

XL.

In reliance upon that promise, the Pollocks agreed to allow Defendant until November 9 to fully perform. Defendant agreed that if the machine did not work by that date, he would pick it up and provide the Pollocks with a refund.

XLI.

On or about November 8, 2019, the Pollocks received the motors that were being shipped in advance of the technician's arrival. The motors were not Yaskawa motors, but rather were again inferior motors.

XLII.

Defendant knew the motors he ordered were not Yaskawa motors.

XLIII.

The Pollocks promptly called Defendant and informed him that they would not accept the non-conforming motors.

XLIV.

Defendant responded by agreeing to make the promised wire transfer, even telling the Pollocks to "hang on" because he was going to his bank. Despite those representations, Defendant never made any wire transfer to the Pollocks.

XLV.

On November 11, 2019, Defendant emailed the Pollocks: "We did our best in the timeframe to make sure this machine works properly, from this point you can contact your lawyer."

XLVI.

The Pollocks only purchased the CNC machine from Defendant based on his representations regarding the specifications and performance standards of the machine.

XLVII.

Defendant told the Pollocks that the CNC machine would meet their needs, which they had explicitly communicated to him.

XLVIII.

The Defendant knew at the time he made the statement that this representation was false.

XLIX.

Defendant told the Pollocks that the CNC machine's reliability, operation, and longevity would fulfill the specific requirements the Pollocks conveyed to Defendant.

L.

The Defendant knew at the time he made the statement that this representation was false.

LI.

Defendant told the Pollocks that the motors were DC brushless Yaskawa motors.

LII.

The Defendant knew at the time he made the statement that the machine would not include DC brushless Yaskawa motors.

LIII.

In fact, in November, 2019, after the Pollocks alerted Defendant to the fact that they did not receive DC brushless Yaskawa motors, Defendant ordered additional inferior motors for installation in the Pollocks' CNC machine.

LIV.

Defendant told the Pollocks that the machine's $CO_2$ servo-motors could go up to 800mm per second and could provide 125 pounds of torque.

LV.

The Defendant knew at the time he made the statement that the machine would not include $CO_2$ servo-motors that could go up to 800mm per second or provide 125 pounds of torque.

LVI.

Defendant told the Pollocks that the unit would have a two-year warranty and that he would provide lifetime support of the machine.

LVII.

The Defendant knew at the time he made the statement that he would not provide a warranty or lifetime support for the maintenance of the machine. In fact, on December 31, 2019, less than two months after Defendant reiterated that he would provide lifetime support to the Pollocks, he failed to renew DLM's corporate registration and shut down the business.

LVIII.

On October 2, 2019, Defendant told the Pollocks that he would replace the controller unit in the CNC machine.

LIX.

The Defendant knew at the time he made the statement that he would not replace the controller unit in the machine.

LX.

Defendant told the Pollocks he would refund their money for the CNC machine, specifically telling them to wait while he went to his bank.

LXI.

The Defendant knew at the time he made the statement that he would neither go to the bank, nor refund the money.

LXII.

Defendant's false representations regarding the machine and its performance were made with the intention and purpose of deceiving Plaintiff.

LXIII.

Plaintiff justifiably relied on Defendant's representations and Plaintiff suffered a loss as a proximate result of those representations.

LXIV.

Defendant told the Pollocks that they purchased a CNC machine with DC brushless CO2 Yaskawa motors meeting certain specifications.

## LXV.

Defendant told the Pollocks that they purchased a CNC machine that could perform up to standards they specifically articulated to Defendant.

## LXVI.

The Pollocks delivered to Defendant the purchase price for the CNC no later than May 2, 2019. That payment was their only obligation under the purchase agreement.

## LXVII.

When Defendant did not provide what was purchased, but rather a substandard machine, he did so with the knowledge that the Pollocks would be harmed.

## LXVIII.

When Defendant provided the non-conforming CNC machine, he provided a reduced value machine.

## LXIX.

Defendant deliberately and intentionally provided the Pollocks with a machine that did not comport with his previous promises.

## LXX.

As an experienced sales person of CNC machines he knew that the reduction of value would harm the Pollocks.

LXXI.

Defendant willfully and maliciously injured the Pollocks' property.

LXXII.

On December 18, 2019, the Pollocks filed a civil lawsuit against Defendant and DLM in the District Court of the Second Judicial District of the State of Idaho. In their Complaint, the Pollocks included, *inter alia*, a claim against Defendant for fraud.

LXXIII.

Defendant participated in the lawsuit, filing a motion to dismiss and working to schedule a mediation and certain depositions.

LXXIV.

Among the documents filed in the case, Plaintiff Jessica Pollock submitted an affidavit in which she attested that:

> 4. I never dealt with anyone at "DLM Lasers" during all times relevant to this
> case other than Petros Charalampopoulos. In his representations to me, he always spoke as though he *was* DLM Lasers. The identity of Mr. Charalampopoulos and DLM Lasers were one and the same.
>
> 5. Given the Defendants' actions with respect to the website, the Facebook presence, the corporate dissolution, and this case, I am very concerned that they are trying to avoid taking responsibility for their actions by simply destroying the entity DLM Lasers and walking away. If they did this, it would cause us extreme harm, because we still have not received any relief from the Defendants. We are just a small start-

up operation. We borrowed the money that we paid to Mr. Charalampopoulos for the machine and have to pay back that money, with interest. I am afraid that Mr. Charalampopoulos is using his "corporation" to get a result that is fundamentally unfair.

## LXXV.

Those statements were uncontroverted.

## LXXVI.

On July 8, 2020, the Idaho District Court entered judgment against Debtor on all claims and awarded Plaintiffs $47,298.25.

## LXXVII.

On September 18, 2020, the Pollocks docketed the judgment in Sherburne County, Minnesota.

## LXXVIII.

Defendant retained the purchase price for the CNC machine from Plaintiff under false pretenses, false representations or actual fraud, and for that reason the indebtedness to Plaintiff is nondischargeable in bankruptcy pursuant to 11 U.S.C. §§ 523(a)(2)(A).

## LXXIX.

Defendant retained the purchase price for the CNC machine from Plaintiff after a willful and malicious injury by Defendant to the property of the Pollocks, and

for that reason the indebtedness to Plaintiff is nondischargeable in bankruptcy pursuant to 11 U.S.C. §§ 523(a)(6).

WHEREFORE, Plaintiff prays for judgment as follows:

1. That this court determine the debt of Defendant Petros Charalampopoulos, to Plaintiffs, Corey and Jessica Pollock, in the amount of $47,298.85, plus applicable judgment interest, is nondischargeable in bankruptcy under 11 U.S.C. §§ 523(a)(2)(A).

2. That this court determine the debt of Defendant Petros Charalampopoulos, to Plaintiffs, Corey and Jessica Pollock, in the amount of $47,298.85, plus applicable judgment interest, is nondischargeable in bankruptcy under 11 U.S.C. §§ 523(a)(6).

3. That Plaintiffs have judgment against Defendant for their costs, disbursements and reasonable attorney's fees herein.

4. For such other and further relief as the court may deem just and proper in the premises.

Dated: July 16, 2021
/s/Martin C. Melang
Martin C. Melang (ID #329393)
Burns & Hansen, P.A.
8401 Wayzata Blvd, Suite 300
Minneapolis, MN 55426
(952) 564-6262
ATTORNEY FOR PLAINTIFF